IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

ST. JUDE MEDICAL, CARDIOLOGY DIVISION, INC., ST. JUDE MEDICAL SYSTEMS AB, and ST. JUDE MEDICAL S.C., INC., : CIVIL ACTION

Plaintiffs,

vs.

VOLCANO CORPORATION,

Defendant. NO. 10-631 (RGA)

- - -

Wilmington, Delaware
Tuesday, October 2,, 2012
4:30 o'clock, p.m.

- - -

BEFORE: HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

- - -

APPEARANCES:

RICHARDS, LAYTON & FINGER
BY: STEVEN J. FINEMAN, ESQ.,
JASON J. RAWNSLEY, ESQ. And
JACLYN C. LEVY, ESQ.

-and-

Valerie J. Gunning
Official Court Reporter

DLA PIPER LLP (US)
BY: JOHN ALLCOCK, ESQ.,
DREW M. WINTRINGHAM, III, ESQ.,
STUART E. POLLACK, ESQ.,
TAMAR Y. DUVDEVANI, ESQ. And
(New York, New York)

Counsel for Plaintiffs

FISH & RICHARDSON
BY: THOMAS L. HALKOWSKI, ESQ.

-and-

FISH & RICHARDSON
BY: FRANK E. SCHERKENBACH, ESQ.
(Boston, Massachusetts)

-and-

FISH & RICHARDSON P.C.
BY: TODD G. MILLER, ESQ.,
MICHAEL A. AMON, ESQ.
(San Diego, California)

-and-

FISH & RICHARDSON P.C.
BY: CHRISTINA D. BROWN-MARSHALL, ESQ.
(Silicon Valley, California)

-and-

APPEARANCES (Continued):

VOLCANO CORPORATION
BY: DARREN LIPPOLDT, ESQ.
General Counsel and Vice-President

Counsel for Defendant

- - -

P R O C E E D I N G S

(Proceedings commenced in the courtroom, beginning at 4:30 p.m.)

THE COURT: Good afternoon, and please be seated.

So I recognize a few of you, but I guess we ought to have on the record who is here in, I guess, St. Jude Medical versus Volcano, Civil Action No. 10-631.

Mr. Fineman?

MR. FINEMAN: Good afternoon, your Honor. Steven Fineman from Richards, Layton & Finger, on behalf of St. Jude.

It gives me pleasure to introduce to the Court John Allcock --

MR. ALLCOCK: Good afternoon, your Honor.

MR. FINEMAN: Drew Wintringham, Stuart Pollack and Tamar Duvdevani, all from DLA Piper.

MR. WINTRINGHAM: Good afternoon, your Honor.

MR. POLLACK: Good afternoon, your Honor.

MS. DUVDEVANI: Good afternoon, your Honor.

MR. FINEMAN: And sitting behind counsel is Jason Rawnsley from my office and Jaclyn Levy, and sitting in the back is Jim Lavner from St. Jude.

Thank you, your Honor.

THE COURT: All right. Thank you.

Hi, Mr. Halkowski.

MR. HALKOWSKI: Good afternoon. Tom Halkowski with Fish & Richardson on behalf of Volcano. And with me here today, Frank Scherkenbach.

MR. SCHERKENBACH: Good afternoon, your Honor.

MR. HALKOWSKI: Todd Miller, Mike Amon, Chrissy Brown-Marshall, and Darin Lippoldt, G.C. for Volcano.

MR. MILLER: Good afternoon.

THE COURT: All right. Welcome, everybody.

All right. So, you know -- so I, I guess using the term loosely, read the pretrial orders, and I noticed a couple of minor things that I thought I could address. And I'm referring -- most of you are referring to the pretrial order for the first trial, but I think from what I could see that pretty much everything that's in the first pretrial order seems to be in the second one, too.

There's an issue that is raised on page 14 about Volcano's proposal that, with the exception of Rule 50 motions, is the parties would not file any written briefs or motions absent a contrary request from the Court or agreement by the parties. And then Volcano's suggestion is that anything that couldn't be resolved between the parties would be presented orally to the Court. St. Jude, of

course, agrees that they'll meet and confer about anything that comes up, but says may benefit the Court to receive short written motions.

There's probably something to be said for what both parties propose. What I'd like to do is, I'd like not to receive any short written motions, but if in lieu of a short written motion, a party has something where they want me to read one case and they give me a copy of the case, then present whatever orally they want to present with it, that would be helpful.

And if you decide to do that, let the other side know. So I don't mind getting one case from each side, but anything more than two cases will not go over very well with me.

So there was that. Then there was also I noticed, and maybe it's a -- maybe it's not important at all, but I'm not in the best position to judge these things. I noticed in the issues of fact that remained to be litigated, sometimes I saw, and I'm particularly looking at page 1 of tab 2. Volcano says -- this is in the St. Jude pretrial -- accused products are prime wire, combo wire and prime wire prestige.

And I think in the -- in the St. Jude version, there were five accused products. SmartWire II, PrimeWire, ComboWire, PrimeWire Prestige, and PrimeWire Prestige Plus.

I'm guessing that PrimeWire Prestige and PrimeWire Prestige Plus are probably two variations of the same thing. Is SmartWire two something different?

MR. POLLACK: Your Honor, Stuart Pollack for St. Jude.

No. SmartWire two is the earliest version of their wires, and then over time they would make certain changes to their wires, which are not really relevant to any of the issues in this case.

THE COURT: Well, so I guess my question is, the parties, do you all understand what products, what the accused products are? I mean, despite the difference in terminology, when you write them, do you all know, because if you do, then I don't really care.

MR. SCHERKENBACH: I think we understand what's accused. I think there may be an issue as to what there is expert testimony on or not, but that's not --

THE COURT: Okay.

MR. SCHERKENBACH: -- before you.

THE COURT: All right. Good enough.

All right. So the parties are submitting, I guess, proposed jury instructions and voir dire on October 9th?

MR. SCHERKENBACH: Yes, your Honor.

MR. POLLACK: Yes.

THE COURT: And one of the side benefits I was hoping of doing these two trials like this is that since whatever jury instructions are given in the first one are likely to be given in the second one, that it might actually promote agreement.

In terms of a -- is there a schedule or a plan to submit a proposed verdict form for the two cases?

MR. POLLACK: Yes, your Honor, also on October 9th.

THE COURT: Okay. Thank you. Maybe that was in the letter. I just didn't notice it.

All right. In terms of things that you could submit that would help me is, it would be helpful for each one of the proposed motions in limine that are in the two pretrial orders, if whoever is the proponent of the motion in limine would submit a proposed order that says very specifically what exactly it is you want excluded. I mean, sometimes -- it would just help because sometimes I'm reading these things and I'm just -- I'm not even a hundred percent sure what exactly it is that you want excluded. I know you all know better than I do what it is you're talking about.

So I was hoping -- today is the 2nd. I was hoping maybe this was not too difficult and you could submit these by the end of Thursday, the 4th?

MR. SCHERKENBACH: That would be fine.

MR. POLLACK: Fine, your Honor.

THE COURT: All right. There was, in the summary judgment briefing, there was an argument about equitable estoppel, and I forget who it was who was trying to equitably estop whom, but it went back like the early 1990s or some time in the 1990s. And maybe it's only equitable estoppel argument in the summary judgment briefing. I hope it is.

And what I was wondering is, it seemed to be the briefing was based on documents and there seemed to be very little evidence that there was any live testimony anywhere on this topic.

And this is all leading up to the question of, because I understand this is an issue for me, and what I was wondering is, if I don't rule on it in summary judgment, are the parties at some later point going to have any live testimony on the topic?

MR. WINTRINGHAM: I don't believe there will be live testimony. It will just be on the briefs, your Honor.

MR. SCHERKENBACH: We would not have any live testimony on that issue either.

THE COURT: Well, so, I guess the question is, assuming that I thought that the matter wasn't -- that it

was possible to see a disputed fact, so it wasn't really what one would normally rule on summary judgment, do the parties want me to -- if I think there is a disputed fact, do the parties want me to rule on it in advance of trial? You know, finding the facts based on what I've got?

MR. WINTRINGHAM: I've actually been advised there may be some live testimony on the issue as far as the letters that were exchanged.

THE COURT: All right.

MR. WINTRINGHAM: And that would be before the bench.

THE COURT: Yes. Okay. All right. Well, then, that kind of makes that question moot.

Do you have any outstanding business with the Magistrate Judge, or are you through with her now and so if anything comes up between now and trial, it will be with me?

MR. FINEMAN: Your Honor, there is one outstanding motion that is pending before Magistrate Judge Thynge that has not been addressed yet, and that is St. Jude's spoliation motion with respect to a certain wire.

THE COURT: And have you had a teleconference or a meeting or something with her on it?

MR. FINEMAN: We had several, or at least a couple conferences on it. There was discovery taken,

and it has been under submission since, I believe, early summer.

MR. POLLACK: Yes, since the end of July.

THE COURT: All right. Maybe I don't want to put you in a difficult position, but she's well aware of it, so that -- I mean, she knows you're expecting her to do something between now and the start of the trial?

MR. FINEMAN: We can certainly contact her chambers, your Honor.

THE COURT: Well, no. I don't want to put you in that position.

Do you happen to have what the docket item of this motion is?

MR. FINEMAN: Your Honor --

THE COURT: Or the date it was filed?

MR. FINEMAN: We can certainly provide that information to your Honor in short order. I don't have it with me today.

THE COURT: Okay.

MR. FINEMAN: Maybe perhaps by the end of the hearing, we might be able to.

THE COURT: All right. Because I would just like be able to -- it may surprise you to learn that the judiciary is not a well-greased machine and that it's possible that she might think I'm doing it. Maybe I am

supposed to be doing it. I don't know. But it would make sense to me for me to just contact her and we can work it out between us.

MR. FINEMAN: Thank you.

THE COURT: But if you let me know, it would help by the end of the hearing to figure out when you at least filed this motion, or whoever filed it, filed it.

MR. FINEMAN: Thank you.

THE COURT: So at trial, who is lead attorney for St. Jude?

MR. ALLCOCK: It will be me, your Honor.

THE COURT: All right. And, Mr. Scherkenbach, are you the lead attorney for Volcano?

MR. SCHERKENBACH: I'm going to do my best.

THE COURT: All right. All right. So I guess that brings me to, I guess, the following.

I'm aware that I've got the Markman hearing. I've construed all the terms and in what I hope is 48 hours or less we'll get out the order that has the constructions. And obviously, for many reasons, it will be useful if you looked at the constructions when you get them, and whenever you get them, make sure things don't fall through the cracks.

If there's some summary judgment motion that you have pending that either depended on -- well, if you rule

this way, it's this, or if you rule that way, it's that -- there are at least I think maybe one or two where maybe the construction I'm giving isn't what either one of you asked for, though I don't think it's any different either.

But if there's -- if there's anything that the order makes you say, Judge, you really ought to pay attention to this because it can take care of something, it will help the trial, you know, a non-argument, argumentative letter to me pointing out what that is would be helpful.

So besides for the Markman and the summary judgment motions, I counted up and there do seem to be two Daubert motions, which I've read. And I think we should get some order out on them pretty soon.

I've actually read all the motions in limine, too. One of the amusing things for me about this is occasionally you read the teleconferences that are held with the Magistrate Judge and see her reaction, because she has a lot more experience than I do, to some of the things I'm doing, and she thought motions in limine was one of the stupidest things she had ever heard of. I can understand now why she said that.

So I will issue some kind of order after I get your proposed orders. And some of these I may, you know, think they're not really well positioned to be ruled on in

advance of trial, but I think some of them I can probably rule on. And so as much as possible, I'm going to try to get everything out this week so that you've got them to work with next week. And I guess next week, while you're doing whatever you are doing, I can be looking at the jury instructions and the voir dire.

So besides for the two Daubert motions, the summary judgment motion, the Markman and the 17 motions in limine and the spoliation motion, are there any other motions or things that I need to be ruling on or somebody needs to be ruling on before the trial?

MR. FINEMAN: Yes, your Honor. There's also an objection from one of Magistrate Judge Thynge's rulings, which is fully briefed and pending before your Honor.

THE COURT: All right. And, you know, now that you mention that, I have seen that, so, yes, that's right.

All right. So what would you all like to speak about? I guess I was going to say, Mr. Fineman, you go first, because you're the plaintiff, but any way you'd like to do it is fine.

MR. FINEMAN: Go ahead. Always willing to be gracious.

MR. SCHERKENBACH: I think Mr. Fineman is being gracious. We talked about one issue jointly just now, and

that is whether your Honor would entertain sending a jury questionnaire to the panel. This is something that has happened in this court before. Some judges have done it, some judges have not, frankly.

We have agreed on a form, or will shortly. It's basically an expanded version of the typical voir dire. You get more demographic information. I personally find it makes the jury selection much faster. There are differing views on that.

In any event, we are in agreement on one. If you would entertain it, we can make that happen. In the old days, we used to coordinate directly with Mr. Trickey in the Clerk's Office and provide the envelopes and all of that sort of thing.

THE COURT: So I did once as a lawyer many years ago do a jury questionnaire. It didn't work out well, but that does not necessarily mean that it's in the garbage can.

So the thing I'm curious about is, when would the potential jurors be filling out this questionnaire?

MR. SCHERKENBACH: Basically, when they get notice of the fact that they're being summoned to serve, it would be in the packet, and they are asked to return it by a date certain. And typically, in the past, it has come in sort of the Thursday before trial, something like that.

When they get back in, the Clerk's Office calls the designated lawyer and we come, you know, pick up the forms.

There's no -- obviously, there's no way to force potential jurors to fill them out. Not all do, most do, but not all, and so you sort of take what you get. But I found it to be useful.

THE COURT: And so this means, then, the lawyers have read these questionnaires before Monday morning?

MR. SCHERKENBACH: Yes. Yes. And the -- to be candid, I mean, the best use of them, you get somewhat more insight into each individual juror, but it's not uncommon in my experience for it to happen that when jurors are asked in real time in the courtroom, some of the voir dire questions, because of the setting and whatever else is going on, they may not remember something. They may not raise their hand. And --

THE COURT: Surely, yes, that happens.

MR. SCHERKENBACH: Well, and if you have this questionnaire, you know, then we can say, well, gee, Judge. You know, juror three didn't say anything about prior jury service, but, you know, on their questionnaire, they actually did, and maybe we ought to ask them about that. So there's benefit, I think, to the Court as well.

THE COURT: I guess the other thing I'm thinking

about, the timing seems kind of short. Today is Tuesday, tomorrow is Wednesday. Monday is a Federal holiday, so there's no mail service.

MR. SCHERKENBACH: We're advised that the, or we think that the questionnaires, or the packets for the jurors for our cases would be going out this week, later this week. I mean, I guess if we missed it, maybe we just missed it or maybe we have to do a separate mailing, if your Honor would allow it. But obviously, logistically, if it doesn't work, so be it.

THE COURT: All right. I'm just raising it because I had heard when I was asking whether we notify the jurors that it was two weeks in advance of trial, which would make me think that it has already happened. But, you know, that's just a guess, and sometimes people round off ten days to two weeks, so who knows.

Do you have this proposed questionnaire with you?

MR. SCHERKENBACH: We can send it to you electronically this evening. I don't know that we have a hard copy here. There was a slight disagreement on one question or two. They've agreed to withdraw that question and we're fine with it.

THE COURT: How long is this questionnaire?

MR. SCHERKENBACH: How many questions?

MR. ALLCOCK: It's about two pages, your Honor.

THE COURT: Two pages. That sounds like something I might go for.

MR. SCHERKENBACH: Perhaps we could send it. You look it over and let us know?

THE COURT: Yes. If you could send it, I think it's to my civil e-mail address. I think it's -- I think Mr. Halkowski and Mr. Fineman would know what it is.

I will look at it, I guess, and actually, I will just, because of the time, I'm not ensure that Mr. Trickey is here.

But Kristen, can you just see if we can't -- can you just see if Trickey is here and see if he knows whether they've already summonsed the jury? I have no idea how Trickey works.

So, in any event, I will consider that. And two pages, after all, does sound like a reasonable amount.

So anything else?

MR. SCHERKENBACH: I do have some other housekeeping-type items, if your Honor has a few minutes.

THE COURT: Yes. No, no. No. Go ahead. Yes, because we're going to be pressed for time in the future.

MR. SCHERKENBACH: Okay. I would just like to know some of your preelections on trial. I haven't had the pleasure yet.

Actually, while we're on the subject of really housekeeping, trial time. Was it the Court's intention to allocate within each week a certain number of hours per side?

THE COURT: Well, I mean, I think I have to, because what I was thinking was that if the hours are 9:30 to 4:30 and you subtract out an hour for lunch and a half-hour for two 15-minute breaks, that leaves five-and-a-half hours a day, which is 27-and-a-half hours in a week.

And realistically, what I was thinking -- I probably ought to say this while my deputy clerk is not here -- is that if we could get the -- you know, my goal would be to get the jury charged by the end of Friday and then that jury can go off and I can borrow a jury room somewhere and then we can start the other one, because I -- you know, haven't looked at the length of your witness list, and being aware of the number of patents here, it's not much time.

So what I was thinking was, if I allow myself an hour to charge a jury, that leaves 26-and-a-half hours. And, you know, it depends how much time we use on voir dire.

So part of the reason why I'm willing to consider a questionnaire is if you think it would actually speed things up as opposed to slowing things down.

He says they're being sent out tomorrow morning. I will tell you what. So why don't you e-mail me tonight and I will read it. And I take it that if it is being sent out tomorrow morning means they're already in the envelopes, that you have a crack team of people who will come over and stuff envelopes or do whatever is necessary?

MR. SCHERKENBACH: We will make that happen, yes.

THE COURT: All right. So getting back to the time, so I was thinking that basically you start with 13-and-a-quarter hours, and every minute we spend on voir dire is lowering -- is coming out of your time, and then whatever is left is split evenly.

MR. SCHERKENBACH: That's certainly fine with Volcano. I actually was going to propose 12 hours per side. Not counting jury selection, it probably will come out about the same.

THE COURT: That's what I'm hoping.

MR. SCHERKENBACH: Okay.

THE COURT: And then presumably for week two, it would be the same thing?

MR. SCHERKENBACH: Yes.

May I raise another?

THE COURT: Yes. Keep going. I'm here as long as I need to be here, so don't worry about me.

MR. SCHERKENBACH: Okay. Policing compliance with expert disclosure requirements.

THE COURT: Yes?

MR. SCHERKENBACH: This is another favorite topic. It has been handled in very different ways.

In my experience here, some judges adhere to the rule that they're not going to police during trial whether somebody is testifying outside the confines of their expert report, and the rule is you do it at your peril, and if it turns out that you do it, A, and, B, it affects something material, you might have to pay for a retrial.

The other possibility, of course, is to actually field those objections and rule on them at the time they're made when somebody is testifying beyond the scope.

I don't know if your Honor has a practice or given any thought about it.

THE COURT: Well, the only two times I've had to do this there was no jury, so it wasn't very good practice. And after the second time, where I don't think I handled it very well, which actually meant I didn't think the lawyers handled it very well, because the first time when I did it, there would be an objection, they would confer. And then either the objection would be withdrawn or the question would be withdrawn, because they're both looking at the same things. They came to the same conclusions. The second time

that it happened so much.

And so I did talk to some of my colleagues, and Judge Robinson said, you know, post-trial, do it at their peril. She's not policing it. And Judge Sleet said, well, bring them to sidebar, rule on them. And I didn't get around to asking Judge Stark.

So I take it, even with Judge Robinson, when she does it, if there's an objection, she makes the two sides confer for a minute, and then it's only if there's -- the objection is not resolved, then you go ahead at your peril.

MR. SCHERKENBACH: Full disclosure. My experience with Judge Robinson is that she does the, you do it at your peril and I sort it out after trial practice, generally. And I believe the last trial I had in front of Judge Stark a couple months ago, he has gravitated to that practice as well.

I don't like it and I would like to see -- I hope the Court is open to ruling in real time, at least on the ones that come up in advance. And I think the ones that really matter do come up in advance, because the way this happens is there are these disclosure requirements for identifying exhibits and demonstratives by witness several days in advance, and it's pretty easy to tell on both sides whether somebody thinks an expert is going to, you know, go outside the bounds of their report. They object. The meet

and confer happens in advance, as it does over any other garden variety exhibit objection.

And those can be reported to you in the morning, the ones that we can't work out get reported to you and you can rule on them or not.

THE COURT: Well, certainly, I'm a lot more amenable on trying to rule on things when the jury is not sitting there, staring at us all.

MR. SCHERKENBACH: Right.

THE COURT: And, you know, now that you say it, yes, it's clear in the two trials where this has come up, sometimes they clearly have not been -- there has been no discussion beforehand, but they also were not terribly important points, which is maybe the reason why they got resolved. And in the trial, there were some problems. They obviously -- they had known about it in advance. I just hadn't.

So, in any event, maybe you can put that on a list to ask me about again on Monday morning, but certainly anybody who has got something they want to bring up outside the presence of the jury, that's okay. I start to think better of it, no harm.

MR. SCHERKENBACH: I'm sorry. I certainly didn't mean to put the Court on the spot.

THE COURT: No, no, no.

MR. SCHERKENBACH: We can talk about it later --

THE COURT: No. It's good to know what's on people's minds.

MR. SCHERKENBACH: All right. One more issue along those lines is -- and, again, my experience practice varies wildly on this one. The extent to which the Court will allow the publication to the jury of impeachment material. So something that is not necessarily independently admissible, but is impeaching I think what is believed to be an inconsistent statement by a witness. Prior deposition testimony generally has been allowed in the Court, in my experience. I know Judge Stark allowed it in the last trial. I personally think that's a good way to go, but not everybody does it that way.

THE COURT: Well, you know, it partly depends whether you all are objecting. I mean, if there's, you know, not just the nonjury trials that I've had, but the jury trial, there has not been a single objection along those lines, so I have not really had to think about it. And I tend to think that if people made the objections, I'd probably sustain them, and we'd really slow down a whole lot.

And so if both sides have an understanding what they want to do, you know, then there's nothing for me to be involved in. But if you are going to -- and I guess I think

both sides should be consistent with -- I mean, it's not something to pull out just to throw somebody off stride at the key moment.

MR. SCHERKENBACH: Well, maybe this is one. I appreciate the guidance. This may be one that Mr. Allcock and I should talk about and see if we're going to have a dispute and then raise it again as appropriate.

THE COURT: I mean certainly in the trial that I've had, people are just putting them up on the things and everybody is reading them as they go along. That didn't offend me.

MR. SCHERKENBACH: Okay. But I mean in a bench trial, I know that's very common.

THE COURT: Right.

MR. SCHERKENBACH: But juries --

THE COURT: Right.

MR. SCHERKENBACH: -- some Judges feel otherwise. Okay. Fair enough.

One more, with your indulgence. Because of the way the trial is now divided up into two trials, we're concerned about any press that might issue in connection with a verdict in trial number one impacting trial number two. And I don't mean, you know, a Bloomberg reporter who reports on the verdict. There's nothing any of us can do about that. But the parties proactively issuing press

releases about the first trial before the second one is done. And I know there are issues involved in preventing that as well from the Court's perspective, but, you know, in this day and age, very hard to keep jurors in a cocoon. And so it would be our view that there should be none of that.

I think both parties have to make an SEC disclosure, for example, an AK filing or something like that, but that's different than a press release, hey, we won, we lost, no, we didn't, we only sort of lost. You know, that sort of thing, which it's very easy for a juror in the second case to --

THE COURT: I have to believe that in a case where the damages are not being considered, there's no chance that the Wilmington News Journal would care if you both issued your best A1 press release. So it might be on the Internet, but it wouldn't be -- so, Mr. Allcock, do you have some comment on that?

MR. ALLCOCK: I agree with what your Honor said. I will talk to my client about it. I think it's a valid concern.

THE COURT: I think it's a valid concern, too, and that actually brings up one other thing, which I think maybe was in a motion in limine, which is the reason why I didn't bring it up a minute ago, sort of whether Jury number

one is told that there will be a jury number two, and presumably jury number two would not be told there was a jury number one because that would be an invitation to mischief. But, you know, my belief is that we shouldn't be telling jury number one that there will be a jury number two.

One of the things I noticed occasionally, I think maybe it was Volcano was saying, needed to give the history of how the accused products infringed, suggested they were going to -- you know, this was in connection with the motion in limine about, I think, maybe whether -- I guess in the first trial, whether St. Jude should be saying Volcano's products -- maybe it was in the second trial. I don't remember which one it was, but somebody wanted to talk about what was happening in the 1990s and early 2000s, before 2004. And it struck me that both, A, from the point of the amount of time that's allotted, and, B, it struck me as just about no relevance as to what the products were doing before the six-year period, so I -- I forget now why this was connected to the other thought.

But, in any event, it struck me that, generally speaking, I don't see why we have to deal, or why the jury should be hearing about products from an infringement perspective that are more than six years ago or six years from when the suit was filed. And so just a thought while

we're talking.

So, Mr. Scherkenbach, what else is on your list?

MR. SCHERKENBACH: Well, that issue was on my list, not the mill, because I didn't think we were really going to get into that, though certainly we agree with the reasoning you just articulated.

We did have a concern actually about jury number one not knowing that our day in court was coming.

THE COURT: Well, no, and that's part of the reason.

Now you reminded me what the connection was, because even though actually I guess the connection -- I've got it backwards. You know, I understand why there may be some talk in the first trial about St. Jude products if they're supposed to be, you know, embodying the patented invention or something, but, you know, for the most part, the first trial should be the patents against your products. And so the -- and so I understand there's going to be some reference to Volcano's patents from invalidity, I guess, points of view.

But the jury shouldn't really be getting a lot of evidence and suggest in the first trial that St. Jude has products that are, I guess, reading on your patents; right? That's what the concern is?

MR. SCHERKENBACH: Yes, though just so it's clear what we're asking for, we're not suggesting for a minute that we be allowed to talk about the fact that we think their patents infringe our patents, and that's --

THE COURT: Right. I got that.

MR. SCHERKENBACH: It's just to put to rest -- I mean, again, we know jurors do this.

In trial number one, they're going to be hearing about St. Jude's claims against Volcano. They're also going to be hearing about Volcano's patents because several of them are prior art and for other reasons. So they're going to know they're patents.

They're all going to be wondering, well, what's up with that? Sort of why aren't we being asked to decide whether St. Jude --

THE COURT: But they shouldn't be hearing that St. Jude has products that are supposedly infringing Volcano's patents.

MR. SCHERKENBACH: Well, I agree from the lawyers through the evidence. I guess what our suggestion is that they be told -- and the second jury could be told the same, sort of the flip side of the coin. I'm not asking to have my cake and eat it, too. Is that both parties have patents. Both parties have claims. This trial is about St. Jude's claims. There will be another trial about

Volcano's claims and vice-versa.

THE COURT: I think the bad side of telling a jury about something that, you know, can't help them make them speculate outweighs whatever risk there is that the jurors will somehow divine without any testimony saying that St. Jude's products, or that St. Jude has products which are accused of infringing Volcano patents, that they'll make that leap.

So I would prefer to try to focus them in on the issues for each trial while the trial is occurring, and not be telling them, you know, don't worry about that guy behind the curtain over there.

MR. SCHERKENBACH: Fair enough. Obviously, we wanted to get the Court's view on that. I appreciate. I understand.

This wasn't raised in the papers, but I don't think this is an issue. But, you know, there's a bunch of other litigation between these parties that technically is still ongoing. You have not been exposed to it, thankfully.

THE COURT: Did I hear, like, Germany or something?

MR. SCHERKENBACH: Well, that's yet another aspect of it. But I was talking, there's a big dispute about OCT technology, optical coherence tomography

technology, and a trade secret case, and there's a Chancery Court action. Sort of a whole other parallel dispute in another technical field that is not -- it's not completely out there in the sense that some of the machines here support that technology in addition to the technology at issue in this case. But we're very clear, I hope, on the concept that no one is going to be saying anything about that stuff in either case. I mean, we certainly don't intend to.

THE COURT: I would certainly hope not.

MR. SCHERKENBACH: All right. Fair enough. I just wanted to raise it.

I appreciate the Court's indulgence. I don't think I have any other specific issues.

THE COURT: Mr. Allcock?

MR. ALLCOCK: Mr. Scherkenbach covered most of the ones I have. I wanted to just ask the Court about its procedure with respect to voir dire, if we have a questionnaire or if we don't.

In my past experience here, it was sort of, I would call it a modified six-pack system, where you basically voir dire the whole potential panel and then challenges, but as you exercise the challenge, you knew who was going to go in the box next.

THE COURT: Okay.

MR. ALLCOCK: I don't know how the Court does it.

THE COURT: I can't remember what it's called, but it -- you know, basically, if we're picking eight jurors and you each have three challenges, so that's 14, so we get 14 jurors lined up, 1 through 14.

MR. ALLCOCK: Right.

THE COURT: And when you secretly tell the clerk who you're striking, X goes through that, so you know exactly -- I mean, you know what the universe is and so you know which three you're getting rid of from the jury, and the other side is getting rid of three.

So, you know, if you care about who the fourth person is, well, that's juror number one. So you know --

MR. ALLCOCK: All right.

THE COURT: By the time you're exercising peremptories, you know exactly who you're exercising in favor of.

MR. ALLCOCK: And what if the other side doesn't exercise three, or we don't?

THE COURT: Then I just strike them from the end.

MR. ALLCOCK: From the end? So the last person goes out?

THE COURT: Right. If you pass, that's goodbye

to number 14.

MR. ALLCOCK: Got it. Okay. Good.

That was, I think, all I had that wasn't already covered.

Mr. Pollack has a witness issue that he's prepared to address.

THE COURT: Okay.

MR. POLLACK: I could do it from here, your Honor, or from the podium.

THE COURT: Why don't you come on around to the podium.

MR. POLLACK: Okay.

THE COURT: I mean, you don't have to.

MR. POLLACK: That's fine. We have one witness, your Honor. Her name is Barack. She is a third party. And her schedule during the second week, she's only able to come during Friday, and that may be during their rebuttal case. Unclear right now.

We've asked Volcano if it would be okay to bring her on Friday. They have not responded yet, and it may be that --

THE COURT: She'll be here Friday morning? I mean, she'll be here in time for Friday?

MR. POLLACK: Yes. Yes. She'll be here on Friday.

THE COURT: Oh, of course, wait a second. Let me think about this for a second. Oh, yes, yes. It could be part of their rebuttal case.

MR. POLLACK: Right.

THE COURT: Sorry. I'm not thinking patents here.

Okay. So have you talked to Mr. Scherkenbach about it?

MR. POLLACK: We've sent them some e-mails. We have not received anything back.

Any concern?

MR. SCHERKENBACH: Well, there is. This is Friday of the second trial, by the way. And here's the issue. There's a -- the most important conference in this field happens that week, and we're all wrestling with it. They've got Ms. Barack, who is, while a third party, is paid by them, and we've got party witnesses who are, frankly, having to move heaven and earth to testify here during our case, even though it's monumentally inconvenient for them, frankly.

And so while I'm always very accommodating of third-party witnesses and I'd like to be here, I think we need to talk more about really, you know, how this is really going to shake out and whether it, in fact, has to be in the middle of our rebuttal case, if that's the way it works out.

I would hope we could work around it. And we may need some accommodation as well with our folks because we're all dealing with the same thing.

THE COURT: I always found when I was out there that people were pretty accommodating because all lawyers have the same problems. So I would expect that -- I take it the person you've mentioned, Mr. Pollack, the reason -- she's a third-party witness. She's paid by you, but not paid as an expert, just her expenses are being paid?

MR. POLLACK: That's right. Expenses.

THE COURT: Because she's outside of subpoena power?

MR. POLLACK: That's right. She's at this TCT conference as well.

THE COURT: So she can call the shots. You are paying her, but if you said, come on Tuesday, she'd say, well, you can't pay me enough to come on Tuesday?

MR. POLLACK: Actually, we proposed Tuesday to them. They said no. That would be during their case. But so only two days.

The reason why is, she's an employee of another company, and that company has insisted that she must be at the conference Wednesday and Thursday --

THE COURT: Well --

MR. POLLACK: -- doing her job.

THE COURT: It sounds to me, I think Mr. Scherkenbach will probably be able to accommodate you.

MR. POLLACK: Yes, I think so.

THE COURT: So --

MR. POLLACK: Okay. We'll work it out with Mr. Scherkenbach.

THE COURT: All right. Well, that's good.

All right. So I guess somebody needs to e-mail me this questionnaire and I will look it over and see.

If I send out the questionnaire, does that mean that the only voir dire that would be done here would be follow-up to the questionnaire?

MR. SCHERKENBACH: That would be my suggestion.

MR. ALLCOCK: Pretty much.

THE COURT: Okay.

MR. ALLCOCK: Your Honor, the way I've used them, and I've used them quite often, not in this venue, this district, but other districts, is my experience is almost all of them fill them out. I mean, maybe 95 percent or something. I could be wrong.

THE COURT: And I guess the five percent that don't fill them out, that tells you what you need to know?

MR. ALLCOCK: Exactly right. And then basically, you know, we know what questions we need to follow up on. Maybe you can even exercise cause challenges

based upon the material that you're provided from -- in the questionnaire. So my experience has been it moves things along quite a lot.

THE COURT: All right. Well, I've got an open mind towards it, and based on the premise that it's two pages and the letters have not gone out, you know, that's part of the fun of being a Judge. You can try things. If it works, great. If it doesn't work, well...

But, you know, I know despite my own not-so-hot experience with them when I was a lawyer, that it was not necessarily a representative showing.

MR. FINEMAN: Your Honor, I'm informed that the DI number for the motion you inquired about earlier is 144, was the opening letter brief letter.

THE COURT: Okay.

MR. FINEMAN: If I find out this evening that that is incorrect, we will contact your Honor.

THE COURT: That's the --

MR. FINEMAN: It was a --

THE COURT: Spoliation motion?

MR. FINEMAN: Yes, your Honor. It was a spoliation letter motion pursuant to the Magistrate Judge's practice.

THE COURT: The only thing that strikes me as odd is, we're like in the 300s now, so this was a really

long time ago?

MR. FINEMAN: Your Honor --

THE COURT: Okay. I see all the shaking heads yes.

MR. POLLACK: Yes.

THE COURT: Okay. All right. Well, I will check into that. So I'm here. If there's nothing else? I've exhausted your questions? Okay. So I guess we will stand in recess.

I will be looking for those motion in limine orders, and I will -- if I like the questionnaire, I will get in touch with Mr. Trickey tomorrow morning, and I guess my staff will get in touch with Mr. Fineman and Mr. Halkowski, to make sure whatever other things need to go along with that. Right?

MR. FINEMAN: Yes, your Honor. We'll do whatever is necessary to accommodate the Court.

THE COURT: All right. Okay. Well, we're in recess.

(Counsel respond, "Thank you, your Honor.")

(Court recessed at 5:20 p.m.)

- - -